IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

RICHARD EVANS,
                    Plaintiff
        v.                                  : Case No. 3:09-cv-17-KRG-KAP
KENNETH CAMERON, SUPERINTENDENT
S.C.I. CRESSON, et al.,
                    Defendants

## Report and Recommendation

### Recommendation

The remaining defendants' motion for summary judgment, docket no. 43, should be granted.

### Report

As the court remembers from the motion to dismiss stage, plaintiff Richard Evans was an inmate at S.C.I. Cresson on June 20, 2007, when an inmate named Cooper entered his cell and stabbed Evans with a home-made knife. Evans sustained nine small puncture wounds to his back and neck. An inmate named Coleman also entered the cell and assaulted Evan's cellmate, Richard Dixon.

Evans alleges that when he went to the guard station and reported the attack and his injuries, corrections officer Woolridge told him and Dixon to identify their attackers, and while Evans was doing so, Cooper walked up and punched Evans in the face. Woolridge restrained Cooper, but Coleman approached and began punching Evans. Dixon came to Evans' aid. A special response team arrived to put an end to the disturbance. Evans was taken to the medical unit and treated for his injuries. Two corrections officers were also injured in the melee. Eight days

later Evans was paroled. He filed the complaint in this matter after being returned to prison on January 18, 2008, for violating parole.

Evans alleges that several employees of Pennsylvania Department of Corrections are liable to him for the injuries inflicted by Cooper. The remaining defendants in this matter - Darrin Reid, the unit manager, Tony Kukucka, a counselor on the scene that day, and corrections officers Woolridge, Clawson, Hippo, Sweet, and Miller (originally named as Sergeant Doe) - seek summary judgment under Fed.R.Civ.P. 56. Rule 56 provides that summary judgment is appropriate if the record (pleadings, depositions, answers to interrogatories, admissions and affidavits) shows that there is no genuine issue as to any material fact. Woodside v. School Dist. of Philadelphia Bd. of Educ., 248 F.3d 129, 130 (3d Cir.2001) (internal quotations and citations omitted). The court must construe the facts in the light most favorable to the non-moving party (here, the plaintiff) Doe v. Centre County, 242 F.3d 437, 446 (3d Cir. 2001), but when a plaintiff bears the burden of proving the elements of a claim a defendant may present a prima facie case for summary judgment by "pointing out to the District Court [] that there is an absence of evidence to support the non-moving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The plaintiff is then required to "do more than simply show that there is some

metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). A plaintiff must produce evidence sufficient to show that a reasonable factfinder might, following the applicable substantive law, return a verdict for him. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

Several defendants, namely Reid, Hippo, and Sweet, are entitled to summary judgment on the factual ground that there is no evidence that they were involved in the events of June 20, 2007. The fight started at approximately 11:07 a.m., and depending on one's point of view it either ended a few moments later or a long while later, but objectively speaking the relevant events were over by 11:30 a.m. Defendant Reid, according to time records which plaintiff does not dispute, did not report for work that day until 2:36 p.m, long after everything relevant to this lawsuit had taken place[1]. Defendant Hippo, according to time records which plaintiff does not dispute, was not at work on June 20, 2007. Defendant Sweet, according to time records which plaintiff does not dispute, was on transport duty from S.C.I.

---

1. Reid's liability for any culpable action or inaction by individual corrections officers who allegedly failed to protect Evans cannot be based on the argument that he is the unit manager and liable under principles of respondeat superior. See Monell v. New York City Dep't of Social Services, 436 U.S. 658 (1978). Evans produces no evidence that allows a plausible inference that Reid has a custom or policy of encouraging or permitting uninterrupted inmate on inmate assaults.

3

Cresson to S.C.I. Waymart from 6:00 a.m. until approximately 5:15 p.m. on June 20, 2007. That leaves corrections officer Woolridge, corrections officer Clawson, corrections officer Miller, and counselor Kukucka. Their liability has been asserted by plaintiff on two grounds: that they failed to prevent the initial attack by Cooper, and failed to prevent the resumption of the attack by Cooper and Coleman.

I

Prison inmates have a constitutional right that prison officials not be deliberately indifferent to their safety or to any other basic human need, including their need to be protected from other inmates. See Day v. Federal Bureau of Prisons, 233 Fed.Appx. 132, 133 (3d Cir.2007). But corrections officers have no duty to intervene in a disturbance to protect an inmate when doing so would be futile, or dangerous to themselves. Smith v. Mensinger, 293 F.3d 641, 650-51 (3d Cir.2002). The key legal concept is deliberate indifference, about which the Supreme Court has said:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Farmer v. Brennan, 511 U.S. 825, 837 (1994). Mere negligence by defendants – that is, evidence that defendants should have been

4

aware of a risk of attack on an inmate, or could have intervened more effectively - is not enough. Even a gross error of judgment does not equal deliberate indifference. Farmer, 511 U.S. at 843 n.8. Hamilton v. Leavy, 117 F.3d 742, 746 (3d Cir.1997).

A defendant's deliberate indifference can be inferred from circumstantial evidence sufficient to permit the conclusion that the defendant consciously disregarded a serious risk to an inmate. Woloszyn v. County of Lawrence, 396 F.3d 314, 321 (3d Cir.2005)(citations omitted). Woloszyn affirmed the grant of summary judgment to corrections personnel at the Lawrence County Prison who allowed a pretrial detainee to commit suicide by hanging himself approximately ninety minutes after arriving at the prison. According to the appellate court, the lack of evidence that Woloszyn was a particular risk for suicide meant that defendants could not have been on notice that Woloszyn faced a substantial risk of serious harm. A fortiori, the individual defendants could not be deliberately indifferent to that risk.

In Day v. Federal Bureau of Prisons, the Third Circuit affirmed the dismissal of the claim of an inmate that prison officials were deliberately indifferent to the prospect that he would be assaulted. The appellate court noted that allegations of a "reign of terror" were not necessary, 233 Fed.Appx. at 134, citing Riley v. Jeffes, 777 Fed.2d 143, 147 (3d Cir.1985), but held that Day's claim failed because there were no allegations

that defendants were aware of any "specific threat of harm against him."

As applied to this case, <u>Woloszyn</u> and <u>Day</u> taken together imply that defendants can be liable for Cooper's initial attack on Evans if and only if they knew of and disregarded a specific threat that Cooper posed to Evans. "Should have known" is not enough. Defendants obviously knew of the resumption of the attack by Cooper because it took place right in front of them: they can be liable for the second assault by Cooper and Coleman if and only if they failed to intervene when it was safe to do so.

II

The defendants assert that the history of events before Cooper's assault on Evans in his cell shows no history of violence or threat of violence against Evans by Cooper. Evans does not even attempt to present evidence that Cooper was a known threat to him or to anyone else. The mere fact that a person is in prison (even for a crime of violence) is not enough to put prison officials on notice that he is a danger to fellow inmates. In the absence of evidence that Cooper was likely to attack Evans, plaintiff cannot convince a jury that any defendant is liable for Cooper's initial attack.

III

The initial attack on Evans resulted in almost all of the discernable injuries to plaintiff, nine puncture wounds in

plaintiff's shoulder and back. The second attack, according to the medical reports which Evans neither disputes nor supplements[2], resulted in Evans receiving a hematoma to the left eyebrow and cheek. Assuming that these injuries were constitutionally significant, the two sides' accounts of how these injuries took place are very similar. Plaintiff's initial complaint alleges that this attack took place in two stages, first in a punch by Cooper, then in a flurry of punches and kicks by Coleman. According to defendants' motion for summary judgment, after Cooper stabbed Evans, Evans went to the control office where Clawson and Woolridge were. Woolridge says that because he and Clawson could not understand what Evans was saying Woolridge exited the control office and went out onto B Wing. Woolridge also started closing the cell doors that were open while he was talking to Evans.

As Woolridge was talking to Evans, Woolridge says he noticed a flash in his peripheral vision, which turned out to be Cooper rushing toward Evans to attack him a second time.

---

2. Evans does not claim he suffered more injuries than the medical records report. And, despite being paroled about a week later, Evans does not even claim he sought any additional medical care. A de minimis injury may support a state law tort claim but cannot serve as the foundation for a claim that corrections officers violated the Eighth Amendment by failing to protect an inmate, otherwise every "push or shove" would give rise to a lawsuit. That is not the law. See Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir.), cert. denied, 414 U.S. 1033 (1973); accord Hudson v. McMillian, 503 U.S. 1 (1992) (unnecessary uses of force which cause even minor injury are actionable, but unnecessary uses of force which cause de minimis or no injury are not actionable.)

7

According to Woolridge, as soon as Cooper started assaulting Evans Woolridge ordered both inmates to stop, pulled Cooper off Evans, and handcuffed Cooper to escort him off the block.

Clawson, who had remained in the control office, confirmed Woolridge's account of the brevity of the attack because when he heard noise coming from B Wing, he saw that Woolridge already had an inmate in handcuffs. Clawson called a corrections officer named Bearer to come to B Wing from A Wing to assist Woolridge because Clawson could not leave the control office.

Woolridge contends that as he was escorting Cooper from the wing Evans was involved in another fight. Woolridge radioed Clawson that there was a multi-inmate fight on the block and that a special response team was needed, took Cooper out of B wing, and returned to break up the fight which involved an inmate Woolridge thinks was named Fields.

Bearer agrees that as he arrived on B Wing and started walking towards Woolridge there was a fight breaking out. Clawson believes that Evans was by the water fountain fighting with two inmates named Fields and Coleman. A very short time after that Clawson called for more corrections officers, who arrived from the RHU annex and took control of the situation.

Kukucka was reportedly in his office at the time of Cooper's first attack on Evans. At about the same time Woolridge was removing the handcuffed Cooper after the second attack,

Kukucka exited his office. Evans was yelling at Kukucka to explain what had happened when two inmates attacked Evans. Kukucka says he yelled at the inmates to stop fighting and even physically intervened to get them to stop.

Clawson estimates that at most seven minutes elapsed from the time he first heard noises out on the wing until the situation was completely under control. Woolridge's estimate is that it "happened very quickly, a matter of minutes." Kukucka says that from the time he exited his office until a group of corrections officers (according to defendants' exhibits these were corrections officers Bearer, Miller, Irwin, Wilson and Yost, Sergeant Hollen and Lieutenant Kearney) arrived no more than two to four minutes passed.

Evans' account, which I must accept where possible, begins with Evans' returning to his cell after lunch with his cell-mate, Richard Dixon. In Evans' words:

I reported directly to the control center (bubble) to get my cell door opened. You must show your identification card, which would have on it printed on tape your cell (#) number. Officer Woolridge who was the block officer responsible for electrically buzzing all door's on B-side. When I was approach by Benjamin Cooper, who had what it appear to be a commissary bag in his right hand.
Cooper ask me did I go to commissary today. I then lock up securing my door behind me. Approximately ten (10) minutes later, the correctional officer (CO) in the control center, CO. Woolridge, buzzed open my cell door for reasons unknown. Fellow inmate Benjamin Cooper entered plaintiff's cell whereupon he proceeded to repeatedly stab plaintiff in the back with a homemade knife. Inmate Derrick Coleman also entered the cell and assaulted plaintiff's cell-mate, Richard Dixon. After Cooper and Coleman left the cell, plaintiff notified CO's Woolridge, Clawson,

9

Hippo, Sweet and Sergeant John Doe of what just took place within my cell.

I then showed them the stab wounds on my back and neck. As these officers, Woolridge, Clawson, Sergeant John Doe, etc. observed my stab wounds they just said okay and it took them about five (5) minutes to respond, but only one officer came, Officer Woolridge that's it. Officer Woolridge told plaintiff to point out his attackers while there were still inmates out of their cell, creating a great risk for plaintiff. So I did just that thinking that Officer Woolridge would protect me from any further attacks. But before I could point out Cooper, Cooper "walked right up" to plaintiff and punched me in the face. Officer Woolridge restrained Cooper and ordered plaintiff to wait by nearby water fountain in front of the control center, where defendant Kukucka, a prison counselor was already standing.

Mr. Kukucka told me to stand right beside him and stated, "I seen the whole incident". Plaintiff was explaining to Kukucka that more than just Cooper was involved, specifically, that Coleman was also involved. Just then as I finish telling Kukucka, Coleman was approaching. I stated that's also one of them right there approaching, pointing at Coleman. Just then, Coleman walked up to plaintiff and starting punching me in the face. Another inmate, one whom I didn't know came right up and helped Coleman, aiding him by kicking plaintiff in the face while plaintiff lay on the ground.

All of the time Kukucka and defendant Reid, the unit manager, stood by watching the beating without intervening or calling for assistance from the CO's in the control center. That is when plaintiff's cell-mate, Richard Dixon, entered the fracas to help plaintiff. When Dixon got involved, another unknown inmate joined the assault by punching Dixon in the face. All of this took place right in front of the control center, neither CO's Clawson, Hippo, Sweet, and Sergeant John Doe came and assist me, nor there fellow officer's. This whole ordeal must a went on for about forty five (45) minutes and [no] response team came on the unit. It was only after the "situation was coming to a slowing point" that the prison response team entered the unit to take control of the situation.

As can be seen, the basic conflict between accounts is in the length of time the second attack on Evans lasted before the situation was brought under control. Evans' placing corrections officers at the scene who (by time cards and travel records) were not even in the prison need not, in the absence of evidence that

10

the records were falsified, be taken in Evans' favor. The other conflict, Evans' estimate of the fracas as going on for forty-five minutes instead of five minutes, is understandable: events naturally seemed shorter to the corrections officers observing the scene and longer and more drawn out to Evans, who was the one being hit.

The irreducible conflict that is that Evans says the defendants at the scene (Kukucka and Clawson, who were there, and Hippo, Sweet, and Reid who were not there) stood by and did nothing while Coleman attacked Evans. Evans' recollection that Cooper came up and punched him as he was in the process of pointing Cooper out to Woolridge, if believed, lets all the defendants off the hook for Cooper's attack. Because Evans had not yet identified Cooper, the defendant would have no reason to believe he was a threat of serious harm to Evans. Second, Cooper, having disposed of his shank, did no further serious harm to Evans by Evans' own account because Cooper came up, threw one punch, and then was secured by Woolridge. Assuming Coleman and another unidentified inmate then kicked an unresisting Evans in the face for forty-five minutes while the defendants did absolutely nothing, Coleman managed only to give (or augment) the bruise on Evans' eyebrow and cheek. The time estimates on both sides are just that, estimates, but the <u>de minimis</u> nature of the injuries Evans received suggests that it is impossible that Evans lay on

the ground being kicked for 45 minutes. Even if a jury could believe that defendants (with no apparent reason to want Evans injured only a week before parole) would be indifferent to an prolonged attack on Evans, and to the danger to themselves from having disorder escalate literally in front of their faces, there is no objective evidence of injury from this second attack. Because there is nothing legally for defendants to have been deliberately indifferent to, summary judgment should be entered in defendants' favor.

Pursuant to 28 U.S.C.§ 636(b)(1), the parties are given notice that they have fourteen days to serve and file written objections to this Report and Recommendation.

DATE: 2 September 2010

Keith A. Pesto,
United States Magistrate Judge

Notice by ECF to counsel of record and by U.S. Mail to:

Richard Evans BW-1187
S.C.I. Houtzdale
P.O. Box 1000
Houtzdale, PA 16698-1000